# United States Court of Appeals for the Federal Circuit

05-1079

AGFA CORPORATION,

Plaintiff-Appellant,

v.

CREO PRODUCTS INC., CREO INC., CREOSCITEX AMERICA CORPORATION,
CREOSSU INC., SCITEX CORPORATION LTD., SCITEX DEVELOPMENT CORP.,
and SCITEX AMERICA CORP.,

Defendants-Appellees.

John G. Kester, Williams & Connolly LLP, of Washington, DC, argued for plaintiff-appellant. With him on the brief were Bruce R. Genderson and Dov P. Grossman. Of counsel was H. Michael Hartmann, Leydig, Voit & Mayer, Ltd., of Chicago, Illinois.

James L. Quarles III, Wilmer Cutler Pickering Hale and Dorr LLP, of Washington, DC, argued for defendants-appellees. With him on the brief were Edward C. DuMont and Jamaica P. Szeliga; and William P. DiSalvatore and S. Calvin Walden, of New York, New York.

Appealed from: United States District Court for the District of Massachusetts

Judge George A. O'Toole, Jr.

# United States Court of Appeals for the Federal Circuit

05-1079

AGFA CORPORATION,

Plaintiff-Appellant,

v.

CREO PRODUCTS INC., CREO INC., CREOSCITEX AMERICA CORPORATION, CREOSSU INC., SCITEX CORPORATION LTD., SCITEX DEVELOPMENT CORP., and SCITEX AMERICA CORP.,

Defendants-Appellees.

_____

DECIDED: June 26, 2006

_____

Before NEWMAN, LOURIE, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge RADER. Dissenting opinion filed by Circuit Judge NEWMAN.

RADER, Circuit Judge.

After a bench trial, the United States District Court for the District of Massachusetts declared all of Agfa Corporation's asserted patents unenforceable for inequitable conduct. Agfa Corp. v. Creo Prods., Inc., Civil Action No. 00-10836-GAO (D. Mass. Oct. 5, 2004) (Judgment) (judgment incorporating the trial court's earlier Findings of Fact, Conclusions of Law and Order for Judgment dated Aug. 24, 2004 (Decision)). Agfa challenges that result and also appeals the trial court's order granting the defendants'[1] request that inequitable conduct be tried to the court, prior to a jury trial on the other issues in the case. Agfa Corp. v. Creo Prods., Inc., Civil Action No. 00-

_____

[1] The defendants, now appellants, include: Creo Prducts, Inc., Creo, Inc., CreoScitex America Corp., CreoSSU Inc., Scitex Corp. Ltd., Scitex Development Corp., and Scitex America Corp. The court will collectively refer to these parties as "Creo."

10836-GAO (D. Mass. July 16, 2003) (<u>Bench Trial Order</u>).  Finally, Agfa appeals the trial court's award of attorney fees under 35 U.S.C. § 285.  <u>Judgment</u> (incorporating the trial court's Award of Attorneys' Fees and Costs, dated Oct. 5, 2004 (<u>Attorney Fees Decision</u>)).  Because the trial court did not err in any of those decisions, and because this court agrees with the trial court's claim construction of the one disputed claim term, this court affirms.

I.

Large scale printing typically uses presses with plates made of materials such as aluminum or polyester.  Conventionally, those plates are formed with a two-step method.  The first step places a desired image on polyester film.  The next step transfers that image to the printing plate.  A light-sensitive chemical emulsion on the plate often facilitates that transfer.  Mounted on the printing press, the plate then reproduces images in a conventional manner.

Unlike that conventional technique, "computer-to-plate" (CTP) systems take a desired image, which can include both written and graphic content, and transfer that image directly from a computer onto the plate.  These plates made with a CTP system then substitute for conventionally formed plates.  CTP systems offer clear advantages over conventional methods of forming printing plates.

Agfa owns U.S. Patent Nos. 5,655,452 (the '452 patent); 5,738,014 (the '014 patent); 5,788,455 (the '455 patent); 5,791,250 (the '250 patent); 5,992,324 (the '324 patent); and 6,000,337 (the '337 patent).  Those patents claim various features of Agfa's CTP system, i.e., its "Galileo" system.  As taught in the asserted patents, Agfa's Galileo system further improves CTP automation by facilitating the creation of multiple plates of

different sizes. Agfa's patents all feature the same specification and drawings. Figure 1

of the '452 patent, reproduced below, is representative of Agfa's patented system.



As shown in that figure, CTP system 10 includes a computer 12 and image processor

14 linked to a platesetter 16. The platesetter includes a plate handler 18 having a

number of cassettes 24, which include stacks of plates 26. During operation, the

handler 18 can move the cassettes up or down such that a "picker" 28 can access any

particular individual plate. Each cassette can include up to 100 plates, each separated

05-1079                               3

from the adjoining plates by a protective "slip sheet," which is automatically removed by a slip sheet removal mechanism 25. While each cassette contains plates of the same size, plate size can differ from cassette to cassette. Thus, during operation, the "picker" can change plate size by selecting a different cassette.

Because the plates are light sensitive, an operator loads the cassettes in a darkroom. After receiving the cassettes, the system operates without human intervention. The system selects a plate and transfers it to the imaging engine 22. The imaging engine prints an image directly onto the plate. The claim construction dispute in this case, however, concerns the plate handler 18. More specifically, as discussed below, the claim construction dispute concerns the meaning of the term "stack" that appears in every asserted claim.

Agfa and Creo compete in the CTP market. Agfa sued Creo alleging that Creo's CTP system infringed all of Agfa's Galileo patents. As a defense, as well as a counterclaim, Creo asserted that all of Agfa's Galileo patents are unenforceable due to Agfa's inequitable conduct before the United States Patent and Trademark Office (PTO). According to Creo, Agfa wrongfully declined to disclose material prior art to the PTO during prosecution of Agfa's asserted patents. Specifically, Creo contended that Agfa did not disclose at least three prior art systems, the Creo Platesetter 3244, the Barco LithoSetter, and the Gerber Cressent/42. Creo further asserted that this prior art was more relevant to Agfa's applications than the single reference discussed in the specification common to all of Agfa's applications, a U.S. Patent on computer-to-film printing. Decision, slip op. at 24-25.

The district court severed the inequitable conduct issue from the rest of the case, and, over Agfa's objection, conducted a bench trial on that issue. At the conclusion of that trial, the district court declared all of Agfa's patents unenforceable. The district court further concluded that Agfa's inequitable conduct rendered the case exceptional and awarded attorneys' fees under 35 U.S.C. § 285.

## II.

"The constitutional question of whether a party is entitled to a jury trial is a question of law," subject to review without deference. Tegal Corp. v. Tokyo Electron Am., Inc., 257 F.3d 1331, 1339 (Fed. Cir. 2001). In this appeal from a bench trial on inequitable conduct, this court reviews the trial court's findings of materiality and intent, the underpinnings of inequitable conduct, for clear error. Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005) (citing Kingsdown Med. Consultants, Ltd. v. Hollister, Inc., 863 F.2d 867, 872 (Fed. Cir. 1988)). This court reviews the ultimate determination of inequitable conduct for an abuse of discretion. Id. The trial court's claim construction, part of its materiality determination, receives plenary review. Cybor Corp. v. FAS Techs., Inc., 138 F.3d 1448, 1456 (Fed. Cir. 1998) (en banc). An award of attorney fees under 35 U.S.C. § 285 involves a two-part determination. This court reviews the trial court's decision to declare the case exceptional for clear error. Forest Labs., Inc. v. Abbott Labs., 339 F.3d 1324, 1328 (Fed. Cir. 2003). Where a trial court has found a case exceptional, its decision to award attorney fees under § 285 is reviewed for an abuse of discretion. Id. (citing Cybor, 138 F.3d at 1460).

A.     JURY TRIAL ISSUE

Procedurally, this case is almost indistinguishable from Gardco Manufacturing, Inc. v. Herst Lighting Co., 820 F.2d 1209 (Fed. Cir. 1987). In Gardco, the plaintiff sought a declaratory judgment on the asserted invalidity, unenforceability, and non-infringement of a patent. Id. at 1210. In the unenforceability and invalidity accusations, the prior art was the defendant-patentee's own prior products, which were not disclosed to the PTO during examination. See id. at 1211, 1213. The defendant counterclaimed for infringement and demanded a jury trial. Id. The trial court in Gardco then separated the inequitable conduct issue for trial without a jury. At the same time, the district court postponed for later, if necessary, a jury trial on infringement and invalidity. Id. at 1210. The bench trial on inequitable conduct determined that the asserted patent was not enforceable. Id. For that reason, the trial court did not impanel a jury.

Gardco differs from this case in only two ways. Due to the declaratory judgment posture, the Gardco parties were arranged differently, i.e., with the accused infringer as plaintiff rather than defendant. Gardco also featured inequitable conduct as a separate claim rather than as a defense to infringement. Neither of those differences has any bearing on the question of the right to a jury trial. See In re Tech. Licensing Corp., 423 F.3d 1286, 1288, 1291 (Fed. Cir. 2005) (right to jury trial is examined without regard to the alignment of the parties or the posture of the issue, i.e. a defense or separate claim). Thus, this court confronts the same situation that Gardco presented nearly twenty years ago. At that time, this court sustained the trial court's approach. Gardco, 820 F.2d at 1213. This court, as it must, sustains the Gardco reasoning in this case.

Nevertheless, Agfa presents two distinct reasons for this court to depart from <u>Gardco</u>. This court declines that invitation.

In the first place, contrary to Agfa's assertion, <u>Gardco</u> is consistent with Supreme Court precedent. In <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959), the Supreme Court explained that a trial judge could not conduct a bench trial (and preclude a jury trial) on equitable declaratory relief claims where that trial would resolve "common" issues with a claim subject to jury resolution. 359 U.S. at 503-04. In <u>Beacon Theatres</u>, the declaratory judgment plaintiff sought to raise essentially the same antitrust issues for which the declaratory judgment defendant sought a jury trial. <u>Id.</u> The Supreme Court declined to limit the declaratory judgment defendant's jury trial rights solely "because Fox took advantage of the availability of declaratory relief to sue Beacon first." <u>Id.</u> at 504. <u>Beacon Theatres</u> specifically noted that both the petitioner's claim and the declaratory relief claim involved "a common issue." <u>Id.</u>

This case involves issues of inequitable conduct (including the materiality of the undisclosed prior art) and validity. Although these issues overlap to some degree, they are not "common" issues as in <u>Beacon Theatres</u>. Because this case does not involve "common" issues, this court need not apply the <u>Beacon Theatres</u> rule to honor Agfa's jury trial request. <u>Beacon Theatres</u> did not use the term "overlapping." While the inequitable conduct and validity questions in this case overlap in the consideration of some aspects of the same relevant evidence, they do not involve a common issue. As <u>Gardco</u> explained:

> The simple fact is that a patent may be valid and yet be rendered unenforceable for misuse or inequitable conduct. Similarly, a valid patent may be (in the abstract) infringed, that is, the accused device may fall within the

scope of the claim, but there will be no liability to the patentee when the patent is unenforceable. Thus the conduct-of-the-applicant-in-the-PTO issue raised in the nonjury trial and the separated infringement/validity issues are distinct and without commonality either as claims or in relation to the underlying fact issues.

820 F.2d at 1213 (footnote and emphasis omitted).

This <u>Gardco</u> reasoning governs even in the face of 37 C.F.R. § 1.56(b). In that regulation, the PTO defines materiality as including information that establishes "a prima facie case of unpatentability." 37 C.F.R. § 1.56(b)(1). Even though the definition of materiality, i.e., "a prima facie case of unpatentability," may implicate some aspects of a validity analysis, the issues of invalidity and materiality are still not common within the legal construct of <u>Beacon Theatres</u>. As <u>Gardco</u> explained, a patent may be valid but not enforceable. Thus inequitable conduct and validity are not "common" issues as <u>Beacon Theatres</u> applied that concept.

Moreover this court's recent decision in <u>Digital Control, Inc. v. Charles Machine Works</u>, 437 F.3d 1309, 1316 (Fed. Cir. 2006), explained that the PTO's Rule 56 did not supplant the earlier, and arguably broader, "reasonable examiner" standard for materiality. <u>Digital Control</u> suggests as well that material prior art need not even be invalidating prior art. Thus, under the reasonable examiner standard, material prior art need not necessarily present a prima facie case of unpatentability. <u>See id.</u> at 1315 (Information is material "where there is a substantial likelihood that a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent.") (quoting an older version of Rule 56). Because the materiality of prior art is distinct from validity issues (without even considering the additional intent requirement for inequitable conduct), this court's earlier reasoning in <u>Gardco</u> remains

sound. Materiality, therefore, does not present common issues with validity. Because the issues are not "common," the Beacon Theatres rule does not apply to protect Afga's jury trial request.

Finally, Gardco explicitly considered and commented on the Supreme Court's decisions, including Beacon Theatres and the later decisions relating to inequitable conduct factors and validity factors. This panel could not depart from Gardco's reasoning even if it accepted the suggestion that materiality and validity present a common issue, which it does not.

In sum, although this case involves both issues of inequitable conduct and validity, the decision to hold a bench trial on inequitable conduct does not preclude the trial court's later grant of a jury trial. The Beacon Theatres case does not mandate that these are "common issues" that must be tried to a jury.

Scire Facias

Next, contrary to Agfa's contentions, Gardco is consistent with some dicta in a footnote in In re Lockwood, 50 F.3d 966 (Fed. Cir. 1995), vacated, 515 U.S. 1182 (1995). In Lockwood, this court confronted a request for a jury trial in an action involving the validity of two patents. Id. at 968. Lockwood explained that "[t]he thrust of the [Seventh] Amendment was to preserve the right to jury trial as it existed in 1791." Id. at 971. After citing Tull v. United States, 481 U.S. 412, 417 (1987), for the proposition that the "Seventh Amendment 'require[s] a jury trial on the merits in those actions that are analogous to 'Suits at common law,''" Lockwood discusses the writ of scire facias. 50 F.3d at 972, 974 n.9. In that discussion, the court remarks that "[t]he contemporary analog of the writ is . . . an action for a declaration of unenforceability due

to inequitable conduct not due to invalidity." Id. at 974 n.9. This court in Lockwood next states that actions corresponding to a writ of scire facias would give rise today to the right to a jury trial. Id. Thus, in its footnote 9, Lockwood seemed to suggest that inequitable conduct is analogous to a writ of scire facias, and because that writ would have ultimately been decided by a jury in 1791, it was wrong for the trial court to decide the inequitable conduct issue without a jury. On close inspection, however, this commentary in Lockwood does not disturb the Gardco reasoning.

Admittedly, Lockwood's analysis is easy to misread for the proposition that a writ of scire facias is the historic analog of inequitable conduct. Lockwood, however, did not speak in terms of historic analogs to inequitable conduct, it instead spoke of inequitable conduct as a potential "contemporary analog" to scire facias. Id. Lockwood was not examining inequitable conduct with an eye toward the right to a jury trial in 1791, rather this court explained that a writ of scire facias was not so analogous to invalidity as to require a jury trial. The footnote in Lockwood noted the language in older opinions suggesting that the writ "was used to attack fraudulently obtained patents," id., and, then suggested in passing that inequitable conduct may serve as a better modern analog for the ancient writ.

This court's use of the word "analog" in the footnote was unfortunate. In re Technology Licensing made the same point, but with language less steeped in Seventh Amendment jurisprudence. See 423 F.3d at 1290 ("The court in Lockwood specifically stated that a proceeding on a writ of scire facias was not analogous to a suit for a declaration of invalidity, but was more akin to an action for inequitable conduct.") (emphasis added, citation omitted). A closer analysis than was needed in Lockwood

reveals that a writ of <u>scire</u> <u>facias</u> was not, in fact, a suit at common law analogous to modern inequitable conduct.

In eighteenth-century England, patents did not undergo an examination, at least as "examination" proceeds in modern patent systems. <u>See</u> Edward C. Walterscheid, <u>The Early Evolution of the United States Patent Law: Antecedents (Part 4)</u>, 78 J. Pat. Trademark Off. Soc'y 77, 83 (1996). Instead, the Sovereign granted patents based solely on a petition and sworn affidavit from the inventor. In modern terms, the early English patent system was a registration system. <u>See</u> <u>id.</u> at 83-84. Without examination, nearly every defect in a patent resulted from some false representation made by the patentee. <u>See</u> W. M. Hindmarch, <u>A Treatise on the Law Relative to Patent Privileges for the Sole Use of Inventions: And the Practice of Obtaining Letters Patents for Inventions</u> 230 (I.G. M'Kinley & J. M. G. Lescure 1847) ("[I]t is the duty of every one obtaining a grant from the Queen, to see that she is correctly informed respecting the grant. [If] the Queen has been deceived in any material particular, by a false representation or suggestions of the grantee, the patent will be wholly void.") (citations omitted).[2] For example, the early English system would require a patentee to attest that the invention was a genuinely new improvement, not already in the public domain. If the evidence later showed the contrary, the court would characterize this defect as a misrepresentation rather than as anticipation, the modern label for the same defect. <u>See</u> <u>id.</u> at 164 ("Patentees . . . must have represented to the Crown that their inventions

---

[2]     Hindmarch is an American reprinting of the original British version. While the date of the publication is 1847, its discussion and analysis, particularly with respect to <u>scire</u> <u>facias</u>, includes citations to opinions issued during the mid-to-late eighteenth century, i.e., at a time relevant to a Seventh Amendment analysis.

were such improvements . . . and if their inventions were not such improvements as represented . . . their patents are void by reason of the false representation or suggestion made to the Crown.") (footnote omitted). Thus, while "fraud" reasonably describes the various bases for voiding eighteenth century patents, the actual history discloses that the <u>conduct</u> of the patentee was not the focus of a decision to void a patent.[3] Finally, a litigant in England in the eighteenth century could also defend against patent infringement by raising the grounds for voiding a patent through a writ of <u>scire facias</u> without seeking the writ at all. <u>Compare</u> <u>id.</u> at 162 ("In an action brought upon a patent[,] objections may be taken to it [including] that the Queen has been deceived in some material particular.") <u>with</u> <u>id.</u> at 231 ("The various objections which can be taken to a patent for an invention, by a person against whom the patentee may institute legal proceedings, have already been considered; and the law provides a remedy for the public by action of <u>scire</u> <u>facias</u>, in which similar objections may be taken . . . .") (citation omitted).

In sum, while a writ of <u>scire</u> <u>facias</u> might be more akin to inequitable conduct than to invalidity, it certainly is not an historic analog that would trigger a Seventh

---

[3] Even if "fraud" was perfectly synonymous with the grounds for voiding an eighteenth century patent, it is not the equivalent of today's inequitable conduct defense. Common law fraud is not synonymous with the broader concept of inequitable conduct. <u>See</u> <u>Nobelpharma AB v. Implant Innovations, Inc.</u>, 141 F.3d 1059, 1069 (Fed. Cir. 1998). Fraud has a number of indispensable elements: (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive (or an equivalent recklessness), (4) justifiable reliance by the deceived party, and (5) injury to the deceived party. <u>Norton v. Curtiss</u>, 433 F.2d 779, 792-93 (CCPA 1970). As noted above, intent was not relevant to the decision to void a patent in eighteenth century England, but rather the more standard doctrines of patentability applied. By the same token, reliance and injury are not elements of today's inequitable conduct defense. Thus, while the label "fraud" may loosely cover both scenarios, they are nevertheless distinct.

Amendment right to a jury trial. This court has consistently treated inequitable conduct as an equitable defense that may be adjudicated by the trial court without a jury. Gardco remains the law of this circuit and governs this case.

Contrary to the dissent's analysis, this court today does not decide that the factual issues underlying a charge of inequitable conduct must be adjudicated by a judge. Thus, the dissent's observation that juries sometimes render verdicts on unenforceability issues is entirely consistent with this court's decision. The court today merely confirms what has been the law at least since Gardco: a judge retains the discretion to conduct a bench trial on the equitable issue of unenforceability in the same case where invalidity is to be tried to a jury.

B. INEQUITABLE CONDUCT

1. Claim Construction

To reach inequitable conduct, the trial court necessarily construed the claims. According to Agfa, the trial court misconstrued the term "stack," common to all asserted claims. As a representative example of the asserted claims, claim 1 of the '452 patent recites:

> 1. A method for automatically selecting a plate for imaging in an automated plate handler, comprising the steps of:
>
> a. automatically positioning a plurality of stacks of plates stored in the plate handler and placing a stack of the plate size required for an imaging job in an access position;
>
> b. automatically separating and removing a single plate from the stack of plates in the access position and transferring the single plate out of the plate handler for imaging; and
>
> c. automatically removing a slip sheet from on top of the stack of plates in the access position.

'452 patent, col. 11, l. 66-col. 12, l. 11 (emphasis added). Agfa argues that the term "stack" covers only a horizontal arrangement of plates, like those shown in figure 1 of the '452 patent, reproduced above. The trial court disagreed, construing stack as "encompassing a number of plates arranged together in an orderly fashion, regardless of the orientation (horizontal or vertical) of the collection as a whole." Decision, slip op. at 22. This court perceives that the trial court's construction, and its reasoning leading to that construction, is sound.

The trial court first consulted the ordinary meaning of "stack," for which it cited a dictionary definition. As this court explained in Phillips v. AWH Corp., the ordinary meaning of some claim terms "may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of widely accepted meaning of commonly understood words." 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc) (citation omitted). "In such cases, general purpose dictionaries may be helpful." Id. This case falls squarely within those guidelines from Phillips. The customary meaning within this field of art does not limit the term "stack."

The meaning of the claim language does not limit "stack" to plates arranged one on top of another. Accordingly, when a stack is tilted more than 45 degrees, it remains a stack because the plates are still arranged in a top-to-bottom fashion. After all, the top of a plate remains its top even when that plate tilts beyond 45 degrees. In other words, the relationship of plates in a stack depends on the orientation of those plates relative to one another. The orientation of the resulting stack from the vantage point of elements outside the stack is irrelevant.

Moreover, nothing in the disclosures of the asserted patents suggests that "stack" has any meaning in the art that would limit its scope to horizontal stacks. The trial court buttressed its construction with the observation that three of the asserted patents include dependent claims that further specify a horizontal (or other particular) arrangement of the claimed stacks. See, e.g., '250 patent, col. 12, ll. 16-18 (claim 2) ("The method according to claim 1, wherein the stacks of plates stored in the plate handler are positioned substantially horizontally."). Properly applying the claim differentiation guideline in the context of dependent claims, the trial court correctly found support for the proposition that those dependent claims suggest that the "stack" standing alone is not limited to horizontally positioned stacks. See Curtiss-Wright Flow Control Corp. v. Velan, Inc., 438 F.3d 1374, 1380 (Fed. Cir. 2006) (explaining the presumption that independent claims do not include the limitations added by their dependent claims).

Similar to this court in Phillips itself, the trial court declined to limit these patent claims to their preferred embodiment. The asserted patents indeed depict a horizontal arrangement of stacks as the preferred embodiment. See, e.g., '452 patent, figure 1 (reproduced above; elements 26 are the stacks). As noted, this court has repeatedly rejected the contention that depiction of a single embodiment in a patent necessarily limits the claims to that depicted scope. See Phillips, 415 F.3d at 1323. This case illustrates again the reason for this court's refusal to limit broader claim language to a preferred embodiment in the patent specification. Of necessity, any depiction of any stack will necessarily show that stack arranged in a particular manner. Nothing beyond that depiction, however, limits the claim language—the defining portion of the patent

document—to some particular orientation.  Without any indication beyond the necessary depiction to suggest limiting the invention to this single embodiment, the broader language of the claims cannot carry that unexpressed and unintended (at the time of patent drafting) limitation.

### 2. Materiality

Unenforceability due to inequitable conduct requires proof of materiality and intent by clear and convincing evidence.  Kingsdown Med. Consultants, Ltd. v. Hollister Inc., 863 F.2d 867, 872 (Fed. Cir. 1988).  Upon finding evidence that satisfies a threshold measure of materiality and intent, the trial court then weighs that evidence to determine that the equities warrant a conclusion of inequitable conduct.  Molins PLC v. Textron, Inc., 48 F.3d 1172, 1178 (Fed. Cir. 1995).  In evaluating materiality, the trial court followed the standard set forth in PTO Rule 56.  That rule considers information material to patentability when:

> [I]t is not cumulative to information already of record or being made of record in the application, and
>
> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the applicant takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2004).  The trial court found that the information withheld by Agfa satisfied both parts (1) and (2) of that rule.  With respect to prima facie unpatentability, part (1) of Rule 56, the trial court focused on prior art CTP systems, patents, and brochures.  This prior art, taken alone or in combination, established a prima facie case

of unpatentability for claims in each of Agfa's asserted patents. The primary challenge to the trial court's materiality finding was that an incorrect claim construction caused error in findings of materiality. Because, as discussed above, the trial court's claim construction was correct, these challenges of error fail.

The trial court also found that the undisclosed prior art was inconsistent with Agfa's position during examination, and so was also material under part (2) of Rule 56. Decision, slip op. at 45. During examination of two of Agfa's applications, the examiner requested clarification about the CTP technology described in the Background sections. In particular, the examiner wished to know what aspects of the CTP technology described in the Background were actually conventional. The trial court found that Agfa's responses to the examiner "were misleading in light of all the information [the patent agent's] had about the Undisclosed CTP References . . . . Indeed, [one of the patent agents] admitted that he could not have made the arguments he did make in response to the Examiner's request if he had disclosed the Creo Platesetter 3244 or the Barco LithoSetter . . . ." Id.

On appeal, Agfa responds that Rule 56 "does not provide that a 'misleading' statement is material." Appellant's Brief at 56. This contention belies the weakness of Agfa's position. The trial court did not find that the misleading statements were material. Instead, the trial court found that undisclosed prior art was material because it was inconsistent with Agfa's misleading statements to the examiner during prosecution.

### 3.  Intent

Turning to intent, the trial court found abundant evidence from which to infer Agfa's culpable intent. Decision, slip op. at 41-45. For example, the evidence regarding

Agfa's knowledge of the Creo Platesetter 3244 was overwhelming: senior Agfa employees, including an inventor named on all the asserted patents and the agents who prosecuted the applications, attended an exposition put on by Agfa at which Creo's product was displayed; Agfa and Creo entered into a reseller agreement under which Agfa agreed to sell Creo's platesetter outside the United States; and Agfa distributed brochures describing Creo's products. Id. slip op. at 4-5. In the words of the trial court, "[i]t was widely known within Agfa, including among the engineering and patent departments, that Agfa was selling Creo's Platesetter 3244, and that Creo was a significant player in the field of CTP output devices." Id. slip op. at 5. In addition to Agfa's particular familiarity with Creo's platesetter, the trial court explained that Agfa was well aware of other CTP prior art. According to the trial court, during development of the Galileo project, Agfa kept a spreadsheet entitled "Overview of [CTP] Products." Id. slip op. at 7. The inventors common to all Agfa's asserted patents possessed that spreadsheet, including its information on the Creo Platesetter 3244, the Barco Lithosetter, and the Gerber Crescent/42. Id. Based on Agfa's extensive knowledge of the prior art, the trial court reasoned that "[Agfa's] failure to disclose information about [the various] CTP systems to the [PTO] supports an inference of intent to deceive because patentability arguments could not have been made had the withheld information been disclosed." Id., slip op. at 42.

Both the evidence and the law support the trial court's intent determination. This court has held that a trial court may infer deceptive intent based on a showing that a patentee withheld references with which it was intimately familiar and which were inconsistent with its own patentability arguments to the PTO. GFI, Inc. v. Franklin

Corp., 265 F.3d 1286, 1275 (Fed. Cir. 2001) (citing LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n, 958 F.2d 1066, 1076 (Fed. Cir. 1992)). "[A] patentee facing a high level of materiality and clear proof that it knew or should have known of that materiality, can expect to find it difficult to establish subject good faith sufficient to prevent the drawing of an inference of intent to mislead." Id. (internal quotes and citation omitted).

On appeal, Agfa questions the trial court's intent finding based on its claim construction argument. Specifically, Agfa argues that regardless of the proper meaning of "stack," it understood that term as applying only to horizontal stacks. Accordingly, Agfa contends that it should not be charged with knowledge of materiality under a claim construction it did not anticipate. Without knowledge of materiality, Agfa argues, the trial court cannot properly infer intent.

To the contrary, the trial court found Agfa's assertion that its patent agents did not appreciate the materiality of the undisclosed references, or that they unintentionally withheld those references, not credible. Specifically, the trial court relied on the substantial documentation and internal discussions of those references in the design and creation of the Galileo system. This court must defer heavily to the trial court's credibility determinations. JVW Enters., Inc. v. Interact Accessories, Inc., 424 F.3d 1324, 1334 (Fed. Cir. 2005) ("[C]redibility determinations by the trial judge can virtually never be clear error.") (citations and internal quotes omitted).

In addition, Agfa's claim construction argument seems to assume that it had no obligation to submit prior art that did not include horizontal stacks. In Agfa's words: "[w]hen stack is given its ordinary meaning of objects placed one on top of another, the CTP references that disclose vertically-oriented plates clearly do not establish a prima

facie case of anticipation." Appellant's Brief at 39 (emphasis added). Thus, Agfa seeks to confine the material references that support an intent finding to only those references that anticipate the claimed invention. Materiality is not synonymous with anticipation, but instead embraces the broader concept of patentability. Thus, even if Agfa's assertions about its understanding of "stack" during prosecution were accepted, the undisclosed prior art would still have been material because some, but not all, of that art included horizontally arranged stacks. See id. at 40.

With respect to the '324 patent, that patent is a continuation of the '014 patent, about which the district court made specific findings. Thus, Fox Industries, Inc. v. Structural Preservation Systems, Inc., 922 F.2d 801 (Fed. Cir. 1990), supports the trial courts decision regarding the '324 patent. Fox Industries explains that inequitable conduct "early in the prosecution may render unenforceable all claims which eventually issue from the same or a related application." Id. at 804. Later applications are, of course, not always tainted by the inequitable conduct of earlier applications. See Baxter Int'l, Inc. v. McGaw, Inc., 149 F.3d 1321, 1332 (Fed. Cir. 1998) ("[W]here the claims are subsequently separated from those tainted by inequitable conduct through a divisional application, and where the issued claims have no relation to the omitted prior art, the patent issued from the divisional application will not also be unenforceable due to inequitable conduct committed in the parent application."). The '324 patent is a continuation, not a divisional, of the '014 patent. Furthermore, Agfa has not suggested that the '324 patent claims subject matter sufficiently distinct from its parent to preclude the trial court's inequitable conduct determination. Thus, the trial court's inequitable conduct analysis properly included the '324 patent.

        4.    Balancing

Beyond the trial court's findings of materiality and intent, Agfa also challenges the trial court's inequitable conduct determination based on those findings.    Agfa's argument is that, notwithstanding its detailed inequitable conduct analysis, the district court did not perform a balancing of materiality and intent.    This court, however, has no doubt that the district court perceived this to be a case of intentional, large scale, inequitable conduct.    "The inequitable conduct established by the evidence here was not incidental or sporadic, but thoroughgoing."    Decision, slip op. at 49.    The district court paints a picture of a group of engineers and patent agents who set out to design their own version of their competitors' products by attending trade shows and reviewing literature, all the while taking notes and holding meetings to decide which features from which printing presses would work well in Agfa's Galileo system.    Those same agents then prepared and prosecuted the asserted patents, never sharing with the PTO any of the information they had compiled about the products upon which they modeled their system.    The trial court thus found high levels of both materiality and intent, and did so with respect to numerous undisclosed pieces of prior art.    In such a case, the trial court did not err by issuing its opinion without an express and detailed balancing analysis.

Hoffmann-La Roche, Inc. v. Promega Corp., 323 F.3d 1354 (Fed. Cir. 2003), also supports this result.    In Hoffmann-La Roche, this court explained the importance of determining "whether the material misrepresentations or omissions in question are sufficiently serious in the light of the evidence of intent to deceive, to warrant the severe sanction of holding the patent unenforceable."    Id. at 1372.    In Hoffmann-La Roche, this court remanded both because this court had not upheld all of the grounds for

unenforceability and because the trial court had not addressed the weight of the various findings of materiality and intent.  Id.  In this case, however, this court has upheld the trial court's findings of high levels of both materiality and intent.  With those findings firmly established in this case, the district court's less express balancing sufficed.  In this setting, Hoffmann-La Roche does not require more.

C.    ATTORNEY FEES

Finally, because this court affirms the trial court's decision, Agfa's argument regarding the award of attorneys' fees fails.  In the words of the trial court: "Even among the subset of 'inequitable conduct' patent cases, this one must be considered exceptional."  Decision, slip op. at 49.   This court affirms the trial court's award of those fees.

CONCLUSION

Because the trial court properly relied on this court's Gardco decision when it held a bench trial on inequitable conduct, and because Agfa has not shown that the trial court committed any errors during that bench trial, this court affirms.

COSTS

Each party shall bear its own costs.

AFFIRMED

# United States Court of Appeals for the Federal Circuit

05-1079

AGFA CORPORATION,

Plaintiff-Appellant,

v.

CREO PRODUCTS INC., CREO INC., CREOSCITEX AMERICA CORPORATION, CREOSSU INC., SCITEX CORPORATION LTD., SCITEX DEVELOPMENT CORP., and SCITEX AMERICA CORP.,

Defendants-Appellees.

Before NEWMAN, <u>Circuit Judge</u>, dissenting.

The panel majority holds that the factual questions of both intent to deceive and materiality of deceptively withheld information are not subject to the jury right. This is a departure from the established jury right, for materiality and intent are quintessential questions of fact, and have been tried to a jury throughout the nation's history. There is no basis for removing these factual questions from the jury when the jury is trier of fact. I respectfully dissent from the court's holding that there is no right to a jury, and that the jury demand can be rejected at the trial court's discretion.

***The Constitution, the Common Law, and Precedent***

The panel majority's holding that there is no right to a jury as to the factual questions of material misrepresentation and deceptive intent is contrary to history, tradition, the Constitution, and precedent. The Seventh Amendment preserves the right to jury trial as it existed at common law. See Laurence H. Tribe, American Constitutional Law 618 (3d ed. 1988). The question of whether a patent was obtained upon "false suggestion" to the granting authority, that is, a material misrepresentation with deceptive intent, was tried to a jury at common law.

This debate concerning the jury right is not new to the Federal Circuit, as this court sought to establish consistent patent law and practice. In In re Lockwood, 50 F.3d 966 (Fed. Cir. 1995), this court reviewed the history of jury trials and fraudulent patent procurement, as remedied by the common law writ of scire facias. See Lockwood, 50 F.3d at 974 n.9 ("The contemporary analog of the writ is thus an action for a declaration of unenforceability due to inequitable conduct. . . . "), which was vacated when Mr. Lockwood withdrew his jury demand, 515 U.S. 1182 (1995). Upon the jury's finding that patents "have been obtained surreptitiously or upon false suggestion," the chancery court could cancel patents granted by the Crown, the court sitting in its "ordinary" common law jurisdiction rather than in its "extraordinary" equity jurisdiction. See 3 William Blackstone, Commentaries on the Laws of England 47 (1765-69) ("The ordinary legal court is much more ancient than the court of equity. Its jurisdiction is to hold plean upon a scire facias to repeal and cancel the king's letters patent, when made against law, or upon untrue suggestions"); see also, e.g., A Systematic Arrangement of Lord Coke's First Institute of the

Laws of England, 328 n.D (J.H. Thomas ed., London, S. Brooke 1818) (explaining the common law jurisdiction of the court of chancery).

Historically, Justice Story recognized the common law nature of the writ of <u>scire facias</u> when he ordered a jury trial for issues of fact in <u>Ex Parte Wood</u>, 22 U.S. (9 Wheat.) 603, 614-15 (1824) ("[I]t is the opinion of the Court . . . that a peremptory mandamus issue to the Judge of the District Court . . . that he award a process, in the nature of a *scire facias*, to the patentees, to show cause why the patent should not be repealed . . . and that, if the issue so joined be an issue of fact, then the trial thereof to be by a jury; if an issue of law, then by the Court, as in other cases."). Issues of fraud, deception, and intent, are traditional jury questions, throughout the nation's courts, <u>e.g.</u>, <u>Forsyth v. Vehmeyer</u>, 177 U.S. 177, 180 (1900) ("Where the state court has decided that the action was for fraud and deceit, and has held that in order to have maintained such action the fraud must have been proved as laid in the declaration, it must be assumed that the verdict and judgment in that action were obtained only upon proof and a finding by the jury of the fact of fraud.")

The panel majority proposes that because patents were not "examined" in 18th Century England, the common law has no relevance to fraud in patent examination. However, in England the jury would find whether a patent was fraudulently obtained, as part of the proceedings of the writ of <u>scire</u> <u>facias</u>. <u>See</u> <u>Rex v. Arkwright</u> (Kings Bench 1785) (raising the issues of invalidity due to anticipation, and of misrepresentation). The court charged the jury:

> Gentlemen of the jury, . . . . If the specification, in any part of it, be materially false or defective, the patent is against law, and cannot be supported.

I have discovered no support for the panel majority's version of history that in 18th Century England "nearly every defect in a patent resulted from some false representation made by a patentee," maj. op. at 11, but even if that is correct, it reinforces, rather than negates, the traditional jury presence, for false statements by a patentee would have been submitted to a jury in 18th Century England.

The common law right was, without quibble, carried into early cases in the United States. See, e.g., Grant v. Raymond, 31 U.S. 218, 240 (1832) (the trial court "instructed the jury that the patent would not be void on this ground, unless such defective or imperfect specification or description arose from design, and for the purpose of deceiving the public"); Delano v. Scott, 7 F. Cas. 378, 382 (E.D. Pa. 1835) (trial court charging the jury that "By the terms of that section, if the specification of the patentee does not contain the whole truth relative to his discovery; or contains more than is necessary, for the purpose of deceiving the public; or if it was not originally discovered by the patentee; or he had surreptitiously obtained a patent for the discovery of another person, judgment shall be rendered for the defendant, and the patent shall be declared void").

Many Federal Circuit decisions illustrate the jury role in finding disputed facts concerning questions of material withholding and deceptive intent, as well as the ultimate fact of whether these infractions warrant permanent unenforceability of the patent. The panel majority's statement that "This court has consistently treated inequitable conduct as an equitable defense that may be adjudicated by the trial court without a jury," maj. op. at 13, is confusing if not misleading, for the statement on its face is accurate, but the majority then holds that there is no jury right and that the factual issues can be adjudicated and balanced only by a judge, and that there is no right to a jury when such is demanded.

Following are some of this court's decisions that illustrate jury adjudication, upon jury demand -- negating the majority's position that precedent requires that Agfa's jury demand can be denied:

Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1374 (Fed. Cir. 2004) ("The jury found both patents valid, and rejected St. Jude's charge that the '288 patent is unenforceable for inequitable conduct during patent prosecution."); Arlington Indus., Inc. v. Bridgeport Fittings, Inc., 345 F.3d 1318, 1325 (Fed. Cir. 2003) ("Finally, the jury found that neither Gretz nor Arlington's patent attorney had committed inequitable conduct in prosecuting the '674 patent."); Abbott Labs v. Syntron Bioresearch, Inc., 334 F.3d 1343, 1348 (Fed. Cir. 2003) ("the jury returned verdicts that Syntron failed to prove by clear and convincing evidence that the claims were anticipated, obvious, invalid due to inventorship error, lacked enablement or written description support, or were unenforceable due to inequitable conduct"); Catalina Lighting v. Lamps Plus, Inc., 295 F.3d 1277, 1283 (Fed. Cir. 2002) ("the jury returned a special verdict form stating that: . . . neither patent was unenforceable due to inequitable conduct.");

Juicy Whip, Inc. v. Orange Bang, Inc., 292 F.3d 728, 735 (Fed. Cir. 2002) ("The district court submitted the issue of inequitable conduct to the jury . . . ."); Upjohn Co. v. Mova Pharma. Corp., 225 F.3d 1306, 1313 (Fed. Cir. 2000) ("We review these grounds for their support of the jury's verdicts of inequitable conduct and unenforceability."); Hupp v. Siroflex of America, Inc., 122 F.3d 1456, 1459 (Fed. Cir. 1997) ("The jury answered special interrogatories on all disputed issues, and in accordance with these findings the court entered judgment that the D'528 patent is invalid and not infringed, that the patent is unenforceable due to inequitable conduct in the Patent and Trademark Office");

Hebert v. Lisle Corp., 99 F.3d 1109, 1112 (Fed. Cir. 1996) ("the United States District Court for the Western District of Louisiana, pursuant to jury verdict, entered judgment that the '940 patent was valid but that it was unenforceable due to inequitable conduct"); Modine Mfg. Co. v. Allen Group, Inc., 917 F.2d 538, 540 (Fed. Cir. 1990) ("In the spring of 1989 the case was tried to a jury, which returned special verdicts finding that Allen had failed to prove by clear and convincing evidence that the patent was invalid, or that it was unenforceable for inequitable conduct."); Lummus Indus., Inc. v. D.M. & E. Corp., 862 F.2d 267, 273 (Fed. Cir. 1988) ("In this case the jury, in answer to specific interrogatories, found that a nondisclosed prior art reference, considered upon reexamination of the '120 patent, was a 'moderately material' reference, and that the inventor and his attorneys had been 'grossly negligent' in failing to call it to the attention of the Patent Office during original examination. Accepting those findings, the trial court concluded that there was no inequitable conduct.");

Mainland Indus., Inc. v. Standal's Patents Ltd., 799 F.2d 746, 747 (Fed. Cir. 1986) (The jury returned the verdict in the form of answers to twenty-three interrogatories, and found that the patents in suit were not invalid, were enforceable and infringed) (overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co., 960 F.2d 1020, 1038 (Fed. Cir. 1992)); Shiley, Inc. v. Bentley Labs, Inc., 794 F.2d 1561, 1564 (Fed. Cir. 1986). ("The special verdict included jury findings that . . . plaintiff did not commit inequitable conduct before the United States Patent and Trademark Office (PTO)"); Shatterproof Glass v. Libbey-Owens Food Co., 758 F.2d 613, 626 (Fed. Cir. 1985) ("The jury was correctly charged as to the law on enforceability, fraud, and misrepresentation, and that clear and convincing evidence was needed for a finding of intentional misrepresentation or

withholding of a material fact from the PTO."); <u>Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.</u>, 750 F.2d 1552, 1557 (Fed. Cir. 1984) ("the jury returned answers to special interrogatories in which it found . . . that Trans-World intended to deceive the Patent and Trademark Office").

As the panel majority correctly points out, findings of deceptive intent often require findings of credibility. Credibility is unequivocally the province of the jury. <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 150 (2000) ("'Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.'") (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986)). The question of whether the patent applicant intended to deceive the patent examiner is a fact, for which a jury may be demanded.

The decision now offered joins a few cases in which panels of the Federal Circuit diverged from history and the weight of our precedent, as in <u>Gardco Mfg., Inc. v. Herst Lighting Co.</u>, 820 F.2d 1209 (Fed. Cir. 1987), <u>Paragon Podiatry Lab, Inc. v. KLM Labs</u>, 984 F.2d 1182, 1190 (Fed. Cir. 1993), where the panel rejected the right to a jury, and a few other cases. This continuing conflict within our court's precedent disserves the public, as does the selective citation in this opinion of only <u>Gardco</u>, ignoring the entire body of contrary precedent, and leaving litigants and trial judges with the burdensome jousting here illustrated.[1] The panel majority misconstrues the Court's holding in <u>Beacon Theatres, Inc. v. Westover</u>, 359 U.S. 500 (1959), where the Court held that factual elements in common

---

[1] The panel majority's characterization of this court's <u>Lockwood</u> decision as "unfortunate" is unfortunate, for <u>Lockwood</u> is on sound foundation. If <u>Lockwood</u> is to be rejected, such a change of precedent requires that the court speak with one voice.

with both legal and equitable issues or, in that case, subject to equitable remedy, could not be deprived of the jury right as to the factual aspects. The Court made clear that when there is judicial discretion it "must, wherever possible, be exercised to preserve the jury trial." Id. at 510-11. In Gardco a panel of this court found that there were no common relevant elements in the specific circumstances of that case. In contrast, in the case at bar where asserted misinformation is charged with being material to patentability and deceptively withheld, these are questions of fact that are directly concerned with both validity and enforceability. Thus the panel majority, in its ruling that the trial judge can always exercise discretion and refuse to try these issues to a jury, misses the point that when there is a jury right as to legal elements, as in Beacon Theatres, there is no discretion to deny the jury right as to factual questions relevant to both the legal and equitable issues. See also, e.g., Cabinet Vision v. Cabinetware, 129 F.3d 595, 600 (Fed. Cir. 1997).

### The PTO's Rule 56

Concern for fraud in obtaining patent rights grew with the growth of technology, as it became apparent that there was an imbalance between the information known to inventors, and the knowledge of patent examiners. See Precision Instruments Mfg. Co. v. Automatic Maintenance Machinery Co., 314 U.S. 806 (1945). As judicial precedent showed the need, the Patent Office established implementing regulations setting the obligations of patent applicants.

The panel majority further states, maj. op. at 8, that it need not follow the criteria of the PTO's rule, 37 C.F.R. §1.56, as recently revised. That revision was adopted after public hearings, and exploration of extensive experience as well as the needs and balance of

patent examination. That revision binds the PTO and, absent sound reason, the Administrative Procedure Act requires this court to follow it uniformly, not selectively in different parts of the same opinion. Compare maj. op. at 8, where the court endorses the prior version of Rule 56, and op. at 16, where the court applies the present version.

### The Claim Construction Issue

I comment briefly on the claim term "stack" and its application by the majority to a vertical, not a horizontal, array. The panel majority states that "when a stack is tilted more than 45 degrees, it remains a stack because the plates are still arranged in a top-to-bottom fashion. After all, the top of a plate remains its top even when that plate tilts beyond 45 degrees." Op. at 14. Perhaps at 45 degrees or even 60 degrees the top of a "stack" is still a "top," but when the plates are lined up in parallel there is no longer a "top" plate, for the plates are no longer "stacked."

The claims and the entire descriptive text make clear that the invention is directed to "substantially horizontal" plates that are stacked one upon the other. When the plates stand vertically -- as in the prior art, and apparently in the accused system, there is no top plate. I cannot agree with the panel majority that "stack" is correctly construed to include the vertical alignment of the prior art.

05-1079                                  9